George **BRESLER**, Plaintiff,

v.

G. Michael **HOSTAGE**, Defendant.

No. 87 Civ. 2224 (JMW).

United States District Court,
S.D. New York.

Oct. 6, 1988.

Jonathan L. Rosner, Rosner & Goodman,
New York City, for plaintiff.

Thomas G. Amon, Gadsby & Hannah,
New York City, for defendant.

## OPINION

WALKER, District Judge:

The plaintiff, George Bresler ("Bresler"), brought this action against the defendant, G. Michael Hostage ("Hostage"), seeking 1) a judgment of $300,000 for defendant's failure to pay an allegedly outstanding debt owed to plaintiff, and 2) sanctions on the defendant and his attorneys pursuant to Fed.R.Civ.P. 11. The case is currently before the Court on plaintiff's motion for summary judgment on his claims and dismissal of the defendant's counterclaims. For the reasons stated below, the Court grants the plaintiff's motion in all respects, except that sanctions are not awarded.

### Facts

Bresler is an attorney admitted to practice in New York. Beginning in 1981, Bresler represented Hostage, a Massachusetts resident and then-chairman of Howard Johnson's Co. ("Howard Johnson's") in Hostage's contract negotiations with Imperial Group, Howard Johnson's parent company. From 1984 through much of 1985, Bresler also sought to secure an ownership interest for Hostage once it appeared that Howard Johnson's would be reorganized in some manner. Bresler and Hostage agreed that, as compensation for all of his efforts on Hostage's behalf, Bresler would receive 20% of any equity interest in the Howard Johnson's venture received by Hostage.

By September 1985, it was clear that Prime Motor Inns ("Prime") would be purchasing the motel chain, and Bresler pursued negotiations with Prime on behalf of Hostage. On September 23, 1985, at a morning meeting between Bresler and Prime, the latter withdrew its offer of an equity interest to Hostage. Instead, Prime stated its willingness to pay Hostage $6 million in cash. Also at this meeting according to Bresler, Prime suggested that Bresler should receive one million dollars

for his efforts to be split equally between Prime and Hostage. Bresler says that he informed Hostage of the change in Prime's position later in the morning of September 23.

Although Bresler and Hostage resisted the change in Prime's offer, they were unable to obtain any equity interest in the reorganized company. To compensate Bresler for his efforts, it is not disputed that Hostage, Prime, and Bresler eventually agreed that the latter would receive $1 million for services rendered with $600,000 coming from Prime and $400,000 from Hostage. At his deposition, Hostage stated that he "reluctantly acquiesced" to pay Bresler because he:

> "felt under great pressure that day and since George as my attorney was handling my legal affairs, I felt very much in his hands and didn't feel that I was in the position at that point to have a falling out with him." [1]

Subsequent to September 23, Bresler continued to represent Hostage. On November 22, 1985, Bresler and Prime executed a release stating that Bresler would receive $1 million from Prime and Hostage. The form stated that Prime's payment of $600,000 to Bresler was not contingent upon Hostage making payment of $400,000 to Bresler. In late 1986, Hostage asked Bresler to furnish him with a statement for services rendered which Hostage's accountant had asked for. On or about December 10, 1986, Bresler sent his statement for $400,000 to Hostage. Thereafter, Hostage told Bresler that the accountant said the statement "looked adequate," [2] and he followed up with a check dated December 28, 1986, for $100,000 on which he wrote the words "First Payment." In a letter dated January 6, 1987, however, Hostage expressed his intention to pay Bresler only $200,000 of the balance owed.

Bresler initiated this action against Hostage, seeking the $300,000 he alleges is owed him for services rendered. Hostage bases his counterclaims and his opposition to plaintiff's motion largely upon the alle-gation that Bresler negotiated and finalized the transaction with Prime on September 23 not because Bresler believed it was in Hostage's best interests but to ensure that he would receive $1,000,000 in fees. Hostage further asserts that Bresler failed to inform him of his earlier meeting on September 23 with Prime. This alleged conflict of interest necessitates, according to Hostage's counterclaims, that the Court find (1) that Bresler breached his fiduciary duties to Hostage, and (2) that the $600,000 payment to Bresler represents money to which Hostage is entitled.

### Discussion

The Federal Rules authorize summary judgment where "there is no genuine issue as to any material fact ..." Fed.R.Civ.P. 56(c). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The burden, therefore, is on the moving party to establish that no relevant facts are in dispute." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980).

Plaintiff contends that he is entitled to summary judgment under the doctrine of an "account stated." An account stated is "an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or the other." *Chisholm–Ryder Co. v. Sommer & Sommer*, 70 A.D.2d 429, 421 N.Y.S.2d 455, 457 (4th Dept.1979). Once an account has been received, that person " 'is bound to examine the same, or procure some one to examine it for him; if he admits it to be correct, it becomes a stated account and is binding on both parties—the balance being the debt which may be sued for and recovered at law.' " *Kramer, Levin, Nessen, Kamin & Frank-*

---

1. Deposition of Hostage at 51 (Hereafter "Dep. at .").

2. Dep. at 63.

*el v. Aronoff,* 638 F.Supp. 714, 719 (S.D.N.Y.1986) (citation omitted). The account stated is enforceable "unless fraud, mistake or other equitable considerations [are] shown." *Rosenman Colin Freund Lewis & Cohen v. Aronoff,* 93 A.D.2d 745, 461 N.Y.S.2d 297, 299 (1st Dept.1983). In addition, an account may be stated between an attorney and his client. *Marchi Jaffe Cohen Crystal Rosner & Katz v. All–Star Video Corp.,* 107 A.D.2d 597, 483 N.Y.S.2d 707 (1st Dept.1985); *Kramer, Levin,* 638 F.Supp. at 719.

Plaintiff asserts that Hostage's implied agreement to pay the account stated is reflected by Hostage's conduct in any one, or all, of three ways: Hostage's failure to object to the account stated within a reasonable period of time after its receipt, *Kramer, Levin,* 638 F.Supp. at 719; Hostage's express acknowledgement of the indebtedness, *Rosenman Colin,* 461 N.Y.S.2d at 299; and Hostage's partial payment of the account, *Parker Chapin Flattau & Klimpl v. Daelen Corp.,* 59 A.D.2d 375, 399 N.Y.S.2d 222, 224 (1st Dept.1977).

In this case, the statement of account by Bresler was not requested by Hostage until some 15 months after an agreement had allegedly been entered into by the parties. Plaintiff argues convincingly that defendant's failure during that period to criticize the quality of Bresler's legal services, along with Hostage's continued use of those services, compels the conclusion that Hostage's "belated objections [are] insufficient to raise genuine factual issues warranting denial of summary judgment." *Rosenman Colin,* 461 N.Y.S.2d at 299. Moreover, Hostage acknowledged the existence and validity of the debt on numerous occasions. For example, Hostage, in an October 23, 1985, letter to the plaintiff, wrote, "If Prime cannot be convinced to cover you on the $400K, I will pay it as agreed on September 23rd." Finally, Hostage made a partial payment of the debt prior to objecting to the statement he received. Under New York law, the making

of such payments have been viewed as an "acknowledgement of the correctness of the account." *Kramer, Levin,* 638 F.Supp. at 720; *Parker Chapin,* 399 N.Y.S.2d at 224.

Hostage argues, however, that Bresler's alleged failure on September 23, 1985, to inform him of Bresler's negotiations with Prime's representatives unfairly influenced Hostage's decision to pay Bresler $400,000. Hostage maintains that he still had not learned of these allegedly secret negotiations by Bresler when the account statement was presented to him, thus invalidating the account statement on the grounds of "equitable considerations."

The Court concludes that there are no equitable considerations militating against the enforcement of the account stated. At his deposition, Hostage could not remember the exact sequence of events on September 23. While he testified that Prime's representatives first informed him of the withdrawal of the equity offer, he later admitted that Bresler may have been the first to inform him of the change in Prime's offer and the need to compensate Bresler for his efforts given the absence of any equity interest.[3]

Hostage has come forward with no other competent evidence suggesting that Bresler failed to inform him of the earlier meeting with Prime on September 23.[4] Indeed, Bresler volunteered the fact that the withdrawal of the equity offer and his compensation were discussed in a meeting with Prime's representatives on September 23 prior to his meeting with Hostage. He also testified that he informed Hostage of Prime's suggestion concerning his compensation. Although Hostage's counsel appeared shocked that Bresler had so informed Hostage, his lawyer did not seem at all surprised that a meeting between Bresler and Prime had occurred. Further, Hostage admitted at his deposition that he knew Bresler had negotiated with Prime

---

3. Dep. at 50–1.

4. Hostage did belatedly submit an affidavit of an attorney involved in the negotiations on September 23, but that individual was not present at the meeting between Hostage, Bresler, and the representatives of Prime on that day.

**50**

concerning payment of his fees.[5] He also acknowledged that Bresler did not threaten "to blow the deal" or threaten him in any other way once the equity element had been withdrawn.[6]

The Court agrees with plaintiff that the behavior of the defendant in this case further supports the motion for summary judgment. Understandably, Hostage was disappointed that he did not receive any equity interest in the reorganized Howard Johnson's and that he was shouldered with $400,000 of attorney's fees. Nevertheless, on numerous occasions he admitted the existence of this debt as well as the right of Bresler to enforce it. Nor does Hostage's refusal to pay Bresler the remaining $300,000 represent his first effort to avoid paying this debt. On previous occasions, he attempted to shift the burden to Prime without any success. After each attempt, however, Hostage reconfirmed his obligation to pay Bresler $400,000.

To argue at this late date that the agreement to pay Bresler $400,000 is invalid because it lacks consideration is wholly without merit and borders on the frivolous. Parties to a contract are competent to revise the terms of their agreement when events so require. Moreover, Bresler clearly relied on Hostage's promises to compensate him for his services. What actually occurred in this case was a cancellation of the prior agreement and its substitution with one that conformed to the necessities of the deal Bresler was negotiating. By agreeing to the new compensation package, Hostage ensured that Bresler would continue to represent him; otherwise, he may rightly have worried that his uncompensated attorney may not be too concerned with his interests.

■ Hostage further contends that the payment of one million dollars in fees is unconscionable. This contention is also without merit. New York courts have invalidated compensation agreements that were unconscionable or " 'out of proportion

to the value of the attorney's services.' " *Newman v. Silver*, 553 F.Supp. 485, 496 (S.D.N.Y.1982) (citation omitted), *aff'd in part and remanded in part*, 713 F.2d 14 (2d Cir.1983). Here, however, Bresler had been engaged in working on Hostage's behalf since 1981. His bill to Hostage for those services was for $400,000.[7] As a result of these efforts, Hostage had received a contract settlement worth $6 million. Later, when he terminated his employment with Prime in 1986, Bresler again represented Hostage and was able to obtain for his client an additional $900,000 plus a Mercedes–Benz. Bresler did not ask for compensation for his services on this occasion.

Not until this case was filed in April 1987 did Hostage complain that Bresler's fee was excessive. Rather, prior to this litigation Hostage's sole concern was that *he* had to pay a part of the $1,000,000 fee and the effect on his taxes. Indeed, in a letter dated October 1, 1985, Hostage informed Bresler that "[y]ou certainly deserve the full amount." Later, in January 1987, Hostage told that Bresler that he intended to pay him $100,000 less than had been agreed upon because due to a change in the tax laws Bresler would receive more after taxes and be left in the same after-tax position as before the tax law change. Under these circumstances, the Court concludes that the sum of one million dollars paid jointly by Prime and Hostage is not unconscionable.

Defendant also argues that the account stated doctrine is not binding in this case since plaintiff has not satisfied the requirements established in *Rabin v. Faim Information Services, Inc.*, 70 Misc.2d 346, 333 N.Y.S.2d 561, 563 (Sup.Ct.1972). That case holds that the attorney/plaintiff bears the burden of establishing that no undue advantage of the client was taken, that the client was fully informed prior to agreeing to the account, and that the account was fair. To our knowledge, *Rabin* has not been followed by any court and will not be

5. Dep. at 47.

6. *Id.* at 51.

7. Hostage conceded at his deposition that he was not entitled to the $600,000 paid to Bresler. Dep. at 82.

followed by this one. This Court is convinced that the standard enunciated in *Rabin* is vague and places unnecessary burdens on the attorney. Rather, the standard enunciated in *Rosenman, Colin* provides ample opportunity for the client to challenge the account stated, since "equitable considerations" will preclude the finding of an account stated.[8]

■ Defendant has not presented any material facts that demonstrate, as alleged in his second counterclaim, that he is entitled to the $600,000 paid to plaintiff by Prime. Rather, Hostage himself flatly contradicted his own counterclaim when he conceded at deposition that he was not "entitled to receive an additional $600,000 for release of [his] employment agreement with the Howard Johnson Company,"[9] and " 'the deposition of a witness will usually be more reliable than his affidavit.' " *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969) (citation omitted). Accordingly, the second counterclaim is dismissed.[10]

■ Although the Court considers it a very close question, sanctions are not appropriate in this case. Many of defendant's arguments are indeed frivolous.[11] Nevertheless, the doctrine of account stated is a flexible one since "equitable considerations" are to be considered by the court. The Court cannot say that defendant acted improperly in raising those issues which it concluded militated against the enforcement of Bresler's claim for $300,000 from Hostage.

### Conclusion

[5] Plaintiff's motion for summary judgment on his claim against defendant and for dismissal of defendant's counterclaims is granted. Interest on the outstanding legal fees from February 2, 1987, is also awarded.[12] The request for sanctions is denied. Plaintiff is directed to prepare an order awarding him $300,000 plus interest within ten (10) days hereof. Defendant may submit a letter memo objecting to plaintiff's proposed order within five (5) days of receipt of plaintiff's submissions to this Court.

SO ORDERED.

---

8. In any event, the defendant in this case has already conceded that Bresler "deserved" his fees, and the Court has concluded that the fees sought from Hostage are not unconscionable.

9. Dep. at 82.

10. Given the Court's holding that there are no equitable considerations preventing the finding of an account stated, the Court also dismisses the first counterclaim. As stated above, the Court concludes that there are no material issues in dispute concerning the nature of Bresler's representation of Hostage's interests.

11. The Court has addressed each of the arguments made in defendant's motion papers. The defendant, while not pursuing other arguments, does raise other claims which the Court has not addressed since they are without any merit. For example, Hostage meekly suggests that he was under duress when he agreed to pay Bresler

$400,000. Nowhere does he suggest that the agreement is void as a result of economic duress, nor could he successfully, *Union State Bank v. Weaver*, 526 F.Supp. 29, 33 (S.D.N.Y. 1981) ("In order to establish a defense of economic duress, the [party asserting the defense] must demonstrate that an agreement was obtained (1) 'by means of a wrongful threat precluding the exercise of free will;' (2) 'under the press of financial circumstances;' (3) where 'circumstances permitted no other alternative.' ") (citations omitted). Defendant's second affirmative defense is equally baseless for the reasons discussed in *Kramer, Levin*, 638 F.Supp. at 722.

12. On January 29, 1987, Bresler rejected Hostage's offer to pay him $200,000 of the outstanding $300,000 owed. Thus, it is appropriate that interest commence from the date Hostage received this letter, which presumably was Monday, February 2.